IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DEWEY C. MACKAY, III,<br><br>Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br>Case No. 1:10-CR-94<br><br>Judge Dee Benson |

      Before the Court is the resentencing of Defendant Dewey C. MacKay, III. On March 18, 2014, MacKay filed a Motion with Respect to Resentencing. (Dkt. No. 370.) On March 29, 2014, the Government filed its Response. (Dkt. No. 371.) In its Response, the Government incorporated by reference its Supplemental Sentencing Memorandum. (Dkt. No. 372.) The Court heard oral argument on April 15, 2014, Peter Stirba and Jeffrey Mann appearing on behalf of MacKay; Michael Kennedy, Richard Daynes, and Carlos Esqueda appearing on behalf of the United States. Having considered the parties' briefs, arguments, and the relevant law, the Court now issues the following memorandum decision and order.

## BACKGROUND

      On August 5, 2010, MacKay was indicted in the United States District Court for the District of Utah, on 129 counts related to the unlawful distribution of Schedule II and Schedule III controlled substances. (Dkt. No. 1.) Among the counts, MacKay was charged with two counts (Counts 1 and 2), which alleged that MacKay distributed a controlled substance (oxycodone ("Percocet"), a Schedule II controlled substance, and hydrocodone ("Lortab"), a

Schedule III controlled substance, respectively), the use of which resulted in the death of Mr. David Wirick.

The statute under which MacKay was charged for Counts 1 and 2 makes it unlawful "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." 21 U.S.C. § 841(a) (1) (2013). Penalties for violations of § 841(a) include up to 20 years for the unlawful distribution of a Schedule II controlled substance and up to 10 years for a Schedule III controlled substance. However, the penalty is enhanced to a mandatory minimum sentence of 20 years for a Schedule II controlled substance, and a maximum of 15 years for a Schedule III controlled substance, "if death or serious bodily injury *results from* the use of such substance." Id. at § 841(b)(1)(C) & (b)(1)(E)(i) (emphasis added). The jury was asked to return a special verdict regarding Counts 1 and 2, answering whether Mr. Wirick's death resulted from the drugs prescribed by MacKay. When it came time to instruct the jury, after consultation with the parties and with no request for any specific instructions on the meaning of the statutory language, the Court did not provide any direction as to the meaning of the phrase "results from." (Dkt. No. 250, Jury Instruction No. 22.) The following instruction was given to the jury:

> To find Dr. Mackay guilty of the charges in counts 1 and 2 the government must prove the following two essential elements beyond a reasonable doubt:
> First, that the defendant knowingly and intentionally distributed or dispensed the controlled substances alleged in the indictment; and
> Second, that the defendant knowingly and intentionally prescribed the controlled substances outside the bounds of professional medical practice and not for a legitimate medical purpose.
> If you determine that the above two essential elements are satisfied as to counts 1 and 2 *you must then determine whether or not death resulted from the use of the controlled substances dispensed and distributed by Dr. Mackay to David Wirick.*
> "Death", of course, means exactly that, that an individual has died. You must determine from the evidence, beyond a reasonable doubt, whether or not

2

> David Wirick *died from using the controlled substances dispensed and distributed by the defendant*. The government also must prove that the death was a reasonably foreseeable consequence of the defendant's conduct. It is not necessary, however, for the government to prove that David Wirick's death was the intended result of the defendant's dispensing and distributing of the controlled substances.

(Id.) (emphasis added).

This instruction was the only direction given to the jury regarding the law on this subject. As can be seen, it refers to the controlled substances in plural and provides no interpretation of the meaning of the phrase "whether or not death 'resulted from' the use of the controlled substances" provided by MacKay.

On August 9, 2011, at the close of the government's case-in-chief, MacKay moved for a judgment of acquittal on all tried counts, pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure. (Dkt. No. 267.) The Court denied MacKay's motion. On August 16, 2011, after all the evidence had been presented, Dr. MacKay renewed his Rule 29(a) motion with respect to only Counts 1 and 2. The Court reserved judgment on the motion pursuant to Rule 29(b), and the case was submitted to the jury.

On August 18, 2011, MacKay was convicted on 40 counts, including Counts 1 and 2. (Dkt. No. 245 at 1–2.) On December 13, 2011, the Court denied MacKay's Motion for Judgment of Acquittal on Counts 1 and 2. (Dkt. No. 271.)

On December 19, 2011, this Court sentenced MacKay to 240 months incarceration due to the mandatory minimum penalty for his conviction on Count 1. Given the 20-year sentence on Count 1, the Court stated that the sentence for the other counts would be less than 20 years and would run concurrently to the sentence on Count 1. The Court did not specify a sentence for the other counts even though nine of the counts had a maximum statutory term of imprisonment below 240-months (Counts 2, 4-7, 15-17, and 108). (Dkt. Nos. 286, 287.) The Court also was

3

not requested and did not explain in any detail why it departed downward from the advisory Guideline range in its sentence for Count 1. (Id.)

On January 4, 2012, MacKay filed a Notice of Appeal to the United States Court of Appeals for the Tenth Circuit. (Dkt. No. 294.) One of the many grounds on which MacKay based his appeal was that this Court committed error when it sentenced him to a general 240-month sentence of imprisonment, rather than specifying individual sentences for each offense. United States v. MacKay, 715 F.3d 807, 846 (10th Cir. 2013). Mackay also claimed on appeal that there were insufficient facts to support the jury's verdict on Counts 1 and 2. The Government argued the evidence was sufficient. The evidence regarding the cause of death of Mr. Wirick can be summarized as follows:

- The Government introduced into evidence Mr. Wirick's autopsy report, prepared by Dr. Maureen Frikke, an assistant medical examiner. (Gov.'s Trial Ex. 21 at 1–2.) Dr. Frikke's report listed the cause of death as drug poisoning due to a combination of hydrocodone and oxycodone, and pneumonia as a complication of the drug poisoning. (Dkt. No. 370-1 at 1-2.) Dr. Frikke also reported that the concentrations of each drug were "below the concentration range that has been reported to cause death when it is the only drug present." (Id. at 2.) Dr. Frikke did not testify because she passed away prior to trial.

- At trial, the Government called Dr. Todd Grey, Utah's Chief Medical Examiner, to testify. Dr. Grey opined that Mr. Wirick "died as a result of combined effects of drug toxicities, specifically with oxycodone and diazepam (Valium) as well as bronchopneumonia, or infection of the lungs." (Dkt. No. 370-2 at 8-9.) Dr. Grey testified that the level of hydrocodone was "above expected therapeutic and just below the lower limit of what is considered potentially toxic" and that the level of oxycodone was in the "high therapeutic range." (Id. at 14-15.) Dr. Grey testified that without the drugs in Mr. Wirick's system, the pneumonia that was present in Mr. Wirick's lungs was "potentially lethal." (Id. at 23.)

- The Government also called Dr. Stacey Hail, a toxicologist, to testify. Dr. Hail opined that Mr. Wirick's death resulted from a combination of the drugs. Dr. Hail testified, "The opinion is that the hydrocodone and oxycodone were the drugs that resulted in his death. And I would also list out the Valium, the diazepam, as contributing, as well as the Soma, which is listed on this report as carisoprodol. That would add as well into the central nervous system

4

- depression, but none of this would have occurred without the oxycodone and hydrocodone." (Dkt. No. 370-2 at 29.) Dr. Hail excluded pneumonia as an immediate cause of death.

- MacKay called Dr. Michael Baden, a forensic pathologist, to testify. Dr. Baden testified that Mr. Wirick "died of a severe untreated undiagnosed pneumonia." (Dkt. No. 370-3 at 6.) Dr. Baden concluded that Mr. Wirick's "[p]neumonia was sufficient in and of itself to be lethal or fatal and caused his death because of its extent to the lungs, and the drugs were not." Id. at 7.)

On April 30, 2013, the Tenth Circuit remanded for resentencing because it was unclear whether this Court intended to impose a 240-month sentence on each count, which would be improper. United States v. MacKay, 715 F.3d 807, 846–47 (10th Cir. 2013). The Tenth Circuit instructed this Court at resentencing "to explain why the sentence it imposes is sufficient, but not greater than necessary to satisfy the sentencing objectives." Id. at 846 n. 22. A resentencing hearing was set for September 24, 2013. (Dkt. No. 358.)

On August 26, 2013, MacKay filed a *Petition for a Writ of Certiorari* in the United States Supreme Court. On October 21, 2013, the Solicitor General filed a *Response Memorandum* to MacKay's *Petition*. In the *Response*, the Solicitor General stated:

> On April 29, 2013, this Court granted certiorari in Burrage v. United States, No. 12-7515 (oral argument scheduled for Nov. 12, 2013) . . . . Because this Court's decision in Burrage may affect the proper resolution of this case, the petition for a writ of certiorari should be held pending the Court's resolution of Burrage, and then disposed of as appropriate in light of the decision in that case.

*Memorandum for the United States,* No. 13-274, at 1-2.

On November 5, 2013, this Court granted MacKay's unopposed Motion to Continue Resentencing Hearing, in order to accommodate the outcome in Burrage, and to allow the Supreme Court the opportunity to rule on MacKay's *Petition*. (Dkt. No. 365).

On January 27, 2014, the Supreme Court issued its ruling in Burrage v. United States, 134 S.Ct. 881 (2014), holding "that, at least where the use of the drug distributed by the

defendant is not an independently sufficient cause of the victim's death . . ., a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a *but-for cause* of the death . . . ." Burrage, 134 S.Ct. at 892 (emphasis added). The Supreme Court denied certiorari on MacKay's *Petition* on February 24, 2014. (Dkt. No. 367.)

**ANALYSIS**

### I. Scope of the Resentencing

At the outset, the Court must decide the appropriate scope of resentencing. "[A]lthough resentencing on remand is typically *de novo*, this does not hold true where an appellate court has specifically limited a district court's discretion." United States v. Webb, 98 F.3d 585, 587 (10th Cir. 1996), cert. denied, 137 L. Ed. 2d 229, 117 S. Ct. 1097 (1997). Under the mandate rule, district courts are generally required to conform "with the articulated appellate remand." United States v. Moore, 83 F.3d 1231, 1234 (10th Cir. 1996).

However, this mandate rule "is a discretion-guiding rule subject to exception in the interests of justice." Id. A district court may depart from an appellate court's mandate under exceptional circumstances, including "(1) a dramatic change in controlling legal authority; (2) significant new evidence that was not earlier obtainable through due diligence but has since come to light; or (3) [if] blatant error from the prior sentencing decision would result in serious injustice if uncorrected." Id.

The Government argues that the Court's role in resentencing MacKay is limited to two specific sentencing issues: first, clarification of this Court's intent regarding the sentence imposed for counts other than Count 1; and, second, an explanation of this Court's reasons for varying below the advisory Guideline range in its sentence for Count 1.

6

MacKay argues that the Tenth Circuit remanded for *de novo* resentencing, and in the alternative, that even if the mandate is limited as the Government suggests, that pursuant to Tenth Circuit precedent, Burrage is a sufficient change in controlling legal authority to allow this Court to exceed the mandate. In order to make such a decision, the Court must first examine the Burrage case.

In Burrage, Marcus Burrage was charged with violating § 841(a)(1) for distributing heroin to Joshua Banka and was subject to the enhanced penalty because the Government alleged that Banka's death "resulted from" the use of the heroin. Burrage, 134 S.Ct. at 885. Two medical experts testified at trial regarding the cause of Banka's death. Id. The first testified that multiple drugs were present at the time of death and that the heroin was the only drug above the therapeutic range, but he "could not say whether Banka would have lived had he not taken the heroin." Id.

He concluded that the heroin interacted with the other drugs to cause "respiratory and/or central nervous system depression" and was thus a "contributing factor" to the overall effect that caused death. Id. The second expert also testified that the heroin played a "contributing role," but he also could not say whether Banka would have lived had he not taken the heroin. Id. at 886. The jury was instructed that the Government only had to prove that the heroin was a "contributing cause" of death. Id. Burrage was convicted and received the enhanced penalty. Id.

The Court of Appeals for the Eighth Circuit affirmed Burrage's conviction on the basis that the "contributing-cause" standard was consistent with its prior precedent. Id. The Supreme Court granted certiorari to determine whether a defendant may be convicted under the "results from" provision if the controlled substance was only a contributing cause of the death. Id.

7

The Supreme Court first held that the enhancement is an element of the offense, which must be found beyond a reasonable doubt. Id. at 887 (citing Alleyne v. United States, 133 S.Ct. 2151, 2162–63 (2013)). Therefore, there were two elements of Burrage's crime: "(i) knowing or intentional distribution of heroin, § 841(a)(1); and (ii) death caused by ('resulting from') the use of that drug, § 841(b)(1)(C)." Id. There was no dispute that Burrage had violated the first element. Id. at 887 n.3. The question was whether Banka's death "resulted from" Burrage's distribution; in other words, "whether the use of heroin was the actual cause of Banka's death in the sense that § 841(b)(1)(C) requires." Id. at 887.

The Supreme Court rejected the Eighth Circuit's contributing cause standard by stating: "The language Congress enacted requires death to 'result from' use of the unlawfully distributed drug, not from a combination of factors to which drug use merely contributed." Id. at 891 (emphasis added). Instead, the Court held: "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a *but-for* cause of the death." Id. at 892 (emphasis added).

In this case, the foundation of MacKay's sentence on Counts 1 and 2 depends on the proper interpretation of the penalty enhancement provision of § 841 – specifically whether Mr. Wirick's death "resulted from" the drugs prescribed by MacKay. The Supreme Court's interpretation of that phrase in Burrage is the precise type of "dramatic change in controlling legal authority" contemplated in Moore. Therefore, in accordance with the law of this Circuit and consistent with the mandate of the Tenth Circuit, the Court will impose and explain a sentence that is sufficient, but not greater than necessary for the sentencing purposes, in light of Burrage.

8

## II. Effect of *Burrage* on this Case

Having found Burrage to be a sufficient change in controlling legal authority and that justice requires that Burrage is applicable here, the Court must now decide what effect, if any, Burrage has on MacKay's resentencing. At the close of MacKay's trial, the Court instructed the jury that it must decide on Counts 1 and 2 whether Mr. Wirick's death "resulted from" the use of the drugs prescribed by MacKay. The jury was not given any further direction as to what "resulted from" meant.

The Government argues that this Court's denial of MacKay's Rule 29 Motion, and the Tenth Circuit's declaration on appeal that "a reasonable jury could conclude beyond a reasonable doubt that the oxycodone by itself and the hydrocodone by itself resulted in Wirick's death," United States v. MacKay, 715 F.3d 807, 830 (10th Cir. 2013), constitute the law of the case and are beyond reconsideration at resentencing.

The law of the case "doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618, 75 L. Ed. 2d 318, 103 S. Ct. 1382 (1983). The doctrine has particular relevance following a remand order issued by an appellate court. "When a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal." Rohrbaugh v. Celotex Corp., 53 F.3d 1181, 1183 (10th Cir. 1995).

However, as with the mandate rule, three "exceptionally narrow" grounds justify departing from the law of the case doctrine: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision

9

of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice." McIlravy v Kerr-McGee Coal Corp., 204 F.3d at 1035.

The Court finds exceptions 2 and 3 to both be applicable here. Neither this Court nor the Tenth Circuit had the benefit of Burrage, which has made a contrary decision of the law applicable. In making such a finding, the Court need only look to the evidence regarding Counts 1 and 2 presented at trial. Dr. Frikke's autopsy report stated that each of the drugs present was below the concentration range reported to cause death when it is the only drug present. Drs. Grey and Hail opined that Mr. Wirick's death resulted from a *combination* of drug toxicities, and Dr. Baden blamed pneumonia as the sole cause of Mr. Wirick's death. Not one of the four medical experts testified that either the oxycodone or hydrocodone, acting alone, was a but-for cause of Mr. Wirick's death. Had this Court had the advantage of knowing Burrage at the close of MacKay's trial, it certainly would have instructed the jury differently, and just as clearly would have granted MacKay's Motion for Judgment of Acquittal on Counts 1 and 2 inasmuch as not only was the instruction insufficient, but so too was the evidence.

The Government also argues that Burrage has no effect because this Court did not give a "contributing factor" instruction like the district court in Burrage. Further, the Government contends the Supreme Court's declaration that but-for causation is the plain meaning of "results from," means it is safe to assume that the jury in this case must have arrived at the same definition. MacKay in turn argues that Burrage demands a different result because the jury was not given specific instructions on Counts 1 and 2 that "resulting from" requires "but-for" causation.

The Court agrees with MacKay. In effect the Government asks the Court to find the statutory interpretation skills of the common layperson juror equal to those of Justice Scalia. The

10

Court is unable to make such a finding when this Court, the district court in Burrage, and the Eighth Circuit, all failed to correctly deduce the plain meaning of "resulting from." Whether MacKay must face a 240-month mandatory minimum sentence of incarceration and be held criminally liable for the death of another person depends on the interpretation of "resulting from." In such a situation, the Court has a duty to make sure the jurors got it right. Simply providing the jurors with the "resulting from" language, without more, is not acceptable in light of Burrage. Accordingly, the Court hereby vacates MacKay's enhanced penalty convictions on Counts 1 and 2.

### III. MacKay's New Sentence

In post-Booker sentencing, the Court is obligated to engage in a three-step analysis: first, the Court must correctly determine the advisory Guideline range; second, it must determine whether any Guideline departures are warranted; and third, it must determine if a non-Guideline sentence is reasonable under the factors of 18 U.S.C. § 3553(a). Finally, the Court must adequately explain its sentencing choice. Gall v. United States, 552 U.S. 38, 50 (2007) (citing Rita v. United States, 551 U.S. 338 (2007). Having found that the enhanced penalties of Counts 1 and 2 are not applicable, the Court must now calculate a Guidelines sentence based on the remaining offenses.

#### A. MacKay's Sentence under the Sentencing Guidelines

Counts 1, 8, 9, 10, 11, 12, 13, 14, 18, 19, 20, 21 22, 23, 24, 25, 26, 32, 33, 34, 35, 41, 42, 81, 82, 83, 84, 120, 121, 123, 124, Distribution of a Schedule II Controlled Substance (21 U.S.C. §§ 841(a)(l) and 21 U.S.C. § 841(b)(1)(C)), are punishable by imprisonment up to 20 years. Counts 2, 4, 5, 6, 7, and 108, Distribution of a Schedule III Controlled Substance (21 U.S.C. § 841(a)(1) and 21 U.S.C.§ 841(b)(1)(E)) are punishable by imprisonment up to 10 years. The

Guideline calculation for these counts is determined by the quantity of drugs involved in the offense, adjusted for other relevant Guideline factors, and capped by any statutory maximum sentence.

The amount of oxycodone, hydrocodone and methadone that MacKay prescribed in the counts of conviction (based on the prescriptions admitted as Government [Trial] Exhibit 19) produces the following result when applied to the Drug Quantity Table in the United States Sentencing Guidelines (§ 2D1.1):

> Total oxycodone: 72,975 mg
> 1 g. oxycodone = 6700 g. marijuana
> 72,975 mg oxycodone = 488.93 kg marijuana
>
> Total hydrocodone: 10,200 mg
> 1 g. hydrocodone = 500 g. marijuana
> 10,200 mg hydrocodone = 5.10 kg marijuana
>
> Total methadone: 3,900 mg
> 1 g. methadone = 500 g. marijuana
> 3,900 mg methadone = 1.95 kg marijuana

**Total: 495.98 kg marijuana = Base Offense Level 28.**

The original PSR added two levels for abuse of a position of trust/use of special skill pursuant to U.S.S.G. § 3B1.3, which results in an adjusted Offense Level of 30. MacKay has no prior juvenile or adult criminal history. A criminal history score of 0 results in a Criminal History Category of I. The resulting advisory Guideline range is 97-121 months.

> **B. Whether a non-Guideline sentence is reasonable under the factors of 18 U.S.C. § 3553(a)**

As can be readily ascertained from the calculation performed in the preceding section, the Guideline offense level of 28 is based almost entirely on the quantity of the controlled substances involved. Given the nature and circumstances of the offense and the history and characteristics of the defendant, the Court finds such an approach to be too broad and rigid to provide an

effective method of determining the appropriate sentence in this case.

The Court finds the Guideline range of 97-121 months incarceration to be greater than necessary to meet the sentencing purposes set forth in 18 U.S.C. § 3553(a)(2). A quantity based system may work as a general matter for street dealers (although, even there, the Sentencing Commission is currently attempting to adjust the quantity-dependent drug sentencing guidelines after receiving much public and judicial scrutiny of the importance placed on quantity alone[1]) but it is too blunt an instrument for a case like this one. The unique facts and circumstances of this case, with which the Court became intimately acquainted during the relatively lengthy trial of this case, will be better suited for sentencing purposes by directly addressing the factors set forth in 18 U.S.C. § 3553.

i. 18 U.S.C. § 3553(a)(1)

Pursuant to § 3553(a)(1), our sentencing analysis begins with an examination of "the nature and circumstances of the offense and the history and characteristics of the defendant." The offenses for which MacKay was convicted were of one kind: the illegal distribution of controlled substances to his patients. The Government's case focused on nine people, each of whom at some point became overly dependent on opioid medicines prescribed by MacKay. By its very nature, the case presented the jury with the difficult task of first deciding if MacKay's

---

[1] "Many factors support adoption of this modest amendment. When the drug quantity tables were set at their current level, above the mandatory minimum penalties, drug quantity was the primary driver of drug sentences. There was only one other specific offense characteristic in the drug guideline. Now, there are sixteen specific offense characteristics, including enhancements for violence, firearms, aggravating role, and a whole host of other factors to help ensure that dangerous offenders receive long sentences. Quantity, while still an important proxy for seriousness, no longer needs to be quite as central to the calculation."

Chief Judge Patti B. Saris, Chair, United States Sentencing Commission, Remarks for Public Meeting at 1-2 (April 10, 2014), *available at* http://www.ussc.gov/sites/default/files/pdf/ amendment-process/public-hearings-and-meetings/20140410/Chairs-Remarks.pdf .

prescriptions left the legal terrain of medically-helpful pain management. Then, if the jurors were persuaded that there was such a departure, they faced the perhaps even more difficult task of deciding whether such behavior constituted a kind of medical malpractice, which, although negligent, is not criminal, or whether the doctor had knowingly and intentionally left the field of medicine altogether to become a criminal drug dealer. The boundaries between the mental states that support each of these zones of human behavior are, to be sure, not always easy to distinguish. In the end, the jury found sufficient proof to convict on 40 counts and acquitted on 44 others, often distinguishing between prescriptions to the same patient, which serves to exemplify the conscientiousness of the jury's deliberations and the difficulty of their task. This was not an easy case. It was a close one. There was no direct proof of the inner workings and motivations of MacKay's mind, no extrinsic admissions of a guilty mindset or other unmistakable proof of a medical doctor deciding to become a criminal. But there was significant circumstantial evidence against MacKay. There was evidence that showed him to be inattentive to the conditions of his patients to the point that criminal culpability could rationally be found, as it was. But it is also true that every one of the nine patients in question suffered from legitimate pain and, to varying degrees, lied to their doctor. MacKay, as a criminal defendant, is certainly unique and enigmatic. On the one hand he was presented as a respected medical doctor in the small community of Brigham City, Utah, with many admirers who vigorously attest to his good character. But it is equally true that he had, and has, his detractors and accusers.

To say the least, the nature and circumstances of MacKay's offenses and his history and characteristics are both troubling and complicated. To the extent the Government attempts to depict MacKay as a despicable type of criminal, the Court disagrees. He has no prior criminal history of any kind and his good works are many and cannot be overlooked. Furthermore,

14

recognizing that the sentence imposed on MacKay must be just, the Court does not entirely disregard the considerable negative impacts this case has already had on him and his family. He has already lost standing in his community, faced the humiliation of a public trial, lost his job, spent a great deal of money on his defense, and otherwise experienced major financial set backs, and has no doubt suffered many emotional pains and negative health consequences that accompany such a process. While it can be rightly said that in many respects he brought these problems on himself, they cannot be completely forgotten when attempting to fashion a just sentence.

### ii. 18 U.S.C. § 3553(a)(2)

Against this backdrop, the Court turns its attention to § 3553(a)(2), which requires the Court, "in determining the particular sentence to be imposed," to "consider . . . the need for the sentence,

> (A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

Id.

The Court will examine each of these purposes in turn.

#### 1. (A) To Reflect the Seriousness of the Offense

There can be no question that the subject offense is serious. The Court takes judicial notice of the fact that the abuse and misuse of prescription pain medication is a serious national problem. And the danger posed by the misuse of opioid medications is clearly exacerbated by

15

unscrupulous doctors and other medical professionals who improperly distribute, or aid and abet their distribution, without any legitimate medical justification. An appropriate sentence must not lose focus of the need to vigorously enforce the laws that prohibit the misuse of these potentially dangerous drugs.

2. *(B) To Afford Adequate Deterrence to Criminal Conduct*

Because of the publicity this case received and the perception it has no doubt left on the minds of many people, this case requires a prison sentence. Even though the Court sees no real threat of recidivism from the defendant himself (see (C) below), it is important for the public at large, and the medical community, in particular, to be reminded of the serious consequences that will result when a medical doctor ceases being a medical doctor and becomes a drug dealer. The deterrent effect on others is the most important reason why a significant period of incarceration is necessary here.

3. *(C) To Protect the Public*

MacKay appears to the Court to present no serious threat of recidivism. He has no criminal history. His medical license has been revoked which eliminates his ability to prescribe controlled substances in the future. He is 66 years old and his health is poor. As pointed out above, MacKay has suffered many serious consequences as a result of his criminal convictions. Given his exemplary behavior in prison and his family, church and community associations, the Court finds little or no reason to believe Mackay will engage in criminal behavior in the future.

4. *(D) To Provide the Defendant with Training, Care and/or Treatment*

At present, MacKay has been incarcerated for approximately two years. During that time he has been a model inmate. He has completed over 22 vocational, career, and academic courses for nearly 1,000 hours of education. He has worked as a GED tutor and educational department

16

clerk to assist other inmates to obtain their GED, improve literacy, and prepare them for a return to society. He has obtained and maintained full-time employment while incarcerated. He gets along with the staff and other inmates. He uses his leisure time to exercise daily, to read, to take classes, and to participate in weekly church services by playing the piano, teaching lessons, and singing in the choir. (Def.'s Resentencing Mem. at 23.)

Furthermore, MacKay's present health situation is not good. He suffers from diabetes, coronary artery disease, hypertension, high cholesterol, obesity, gout and cirrhosis of the liver. He was diagnosed with thyroid cancer and had his thyroid removed. He has had cardiac bypass surgery, wrist surgery for carpel tunnel syndrome, prostate surgery, gastric bypass surgery, surgery to insert a heart stent, and surgery to repair diabetic ulcers. Since his incarceration, MacKay has suffered additional health problems including a retinal hemorrhage requiring emergency eye surgery and an infected diabetic ulcer, which could lead to amputation of part of his foot. On account of his many health problems, MacKay must take several medications on a daily basis and is insulin dependent. (Def.'s Resentencing Mem. at 22.) He claims the medical care he receives in prison is far below the care he needs.

## **CONCLUSION**

Taking into consideration all of the many facts and circumstances of this case and the history and characteristics of the defendant, the Court finds that a 36-month period of incarceration will be sufficient but not greater than necessary to comply with the purposes discussed above. Accordingly, it is the judgment of the Court that the defendant, Dewey C. MacKay, III, is placed in the custody of the United States Bureau of Prisons for a period of 36 months, with no period of supervision to follow.

Consistent with the Court's earlier sentence imposed on MacKay, his special assessment

fee will remain at $4,000.00. An Amended Judgment reflecting this sentence will be entered forthwith.

    IT IS SO ORDERED.

    DATED this 7th day of May 2014.

_____
Dee Benson
United States District Judge